UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DESHENA SMIKLE,                    :
                                   :CIVIL ACTION NO. 3:15-CV-2340
          Plaintiff,               :
                                   :(JUDGE CONABOY)
          v.                       :
                                   :
CAROLYN W. COLVIN,                 :
Acting Commissioner of            :
Social Security.                   :
                                   :

---

**<u>MEMORANDUM</u>**

Pending before the Court is Plaintiff's appeal from the
Commissioner's denial of Disability Insurance Benefits ("DIB")
under Title II of the Social Security Act.  (Doc. 1.)  She alleged
disability beginning on January 24, 2011.  (R. 15.)  The
Administrative Law Judge ("ALJ") who evaluated the claim, Reana K.
Sweeney, concluded in her August 4, 2014, decision that Plaintiff's
severe impairments of a degenerative disc disease of the cervical
and lumbar spine, cervical spondylosis, fibromyositis (lumbar),
major depressive disorder, and anxiety disorder generalized did not
alone or in combination meet or equal the listings.  (R. 17.)  She
also found that Plaintiff had the residual functional capacity
("RFC") to perform light work with certain nonexertional
limitations and that she was capable of performing jobs that
existed in significant numbers in the national economy.  (R. 19-
25.)  ALJ Sweeney therefore found Plaintiff was not disabled.  (R.
26.)

With this action, Plaintiff asserts that the Acting

Commissioner's decision should be reversed or remanded for the following reasons: 1) the ALJ erred in failing to address all medical opinions of record; 2) the ALJ erred in failing to follow the treating physician rule; 3) the ALJ erred in failing to discuss Plaintiff's mental impairment; and 4) the ALJ erred in finding Plaintiff not credible.  (Doc. Doc. 14 at 14-15.)  After careful review of the record and the parties' filings, I conclude this appeal is properly denied.

## I. Background

### A.   *Procedural Background*

Plaintiff protectively filed for DIB on July 10, 2012.  (R. 15.)  The claim was initially denied on November 7, 2012, and Plaintiff filed a request for a hearing before an ALJ on December 28, 2012.  (*Id.*)

ALJ Sweeney held a hearing on July 15, 2014.  (*Id.*) Plaintiff, who was represented by an attorney, testified as did Vocational Expert ("VE") Brian Bierley.  (*Id.*)  As noted above, the ALJ issued her unfavorable decision on August 4, 2014, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 26.)

On September 17, 2014, Plaintiff filed a Request for Review with the Appeals Council.  (R. 10.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on October 2, 2015.  (R. 3-7.)  In doing so, the ALJ's decision became the

decision of the Acting Commissioner.  (R. 1.)

On December 7, 2015, Plaintiff filed her action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on February 19, 2016.  (Docs. 10, 11.)  Plaintiff filed her supporting brief on April 4, 2016.  (Doc. 14.)  Defendant filed her brief on May 4, 2016.  (Doc. 15.)  Plaintiff filed a reply brief (Doc. 16) on May 18, 2016, and, therefore, this matter is fully briefed and ripe for disposition.

## B.   *Factual Background*

Plaintiff was born on July 5, 1978, and was thirty-two years old on the alleged disability onset date.  (R. 25.)  Plaintiff completed high school.  (*Id.*)  Her has past relevant work includes work as a customer service representative, transcriber, and proof reader.  (R. 24-25.)

## 1.   Impairment Evidence

The following review of evidence focuses on that relied upon by the parties and relevant to the errors asserted by Plaintiff.

### a.   *Mental Impairments*

On January 25, 2011, Plaintiff saw Baxter Drew Wellmon, M.D., her primary care provider, with complaints of a recurrence of shingles and depression with overwhelmed feelings.  (R. 307.)  Due to Plaintiff's reported emotional problems, crisis intervention was called at Chambersburg Hospital and Plaintiff agreed to be

evaluated there.  (*Id.*)  She was admitted to the hopsital on January 25, 2011, and discharged on January 28, 2011.[1]  (R. 396.) After her January hospitalization, she saw Dr. Wellmon nine times between then and June 2012 without mention of any mental health issues though anxiety and depression were noted in the list of problems.  (R. 298-307.)  At almost every visit, Dr. Wellmon noted that Plaintiff was oriented to person, place, and time.  (*Id.*)

June 12, 2012, office notes indicated the reasons for Plaintiff's visit included shingles due to stress.  (R. 297.)  On the same date Dr. Wellmon noted that Plaintiff "presents with a paper to certify that she is permanently disabled regarding her anxiety and depression however I [have] limited information from her visits and care from her psychiatric counselors.  Before we can fully complete the papers we would need further information before definitely considering her disability status."  (R. 297.)  In July 2012 Plaintiff brought a letter to clarify her depression and anxiety symptoms which Dr. Wellmon noted was "sent to the department of education at patient's request."  (R. 296, 350.)  At Plaintiff's August 8, 2012, office visit, Dr. Wellmon noted that Plaintiff was "concerned about her disability regarding her anxiety before was not completed as I do not have any evidence or

---

[1]  This information is derived from the "Past Psychiatric History" portion of a June 2013 Chambersburg Hospital Discharge Summary.  (R. 394-97.)  Further information about the January 2011 hospitalization is not in the medical records.

4

documentation substantiating her chronic disability regarding her anxiety or depression."  (R. 349.)

At Plaintiff's two visits with Dr. Wellmon in September 2012, mental health issues were not discussed, but at her next visit on January 24, 2013, Plaintiff wanted to discuss her anxiety/depression medications.  (R. 345.)  Dr. Wellmon started Plaintiff on Lamictal at her request due to her suboptimally controlled depression.  (*Id.*)  In February 2013, Dr. Wellmon noted that Plaintiff was not happy with her anxiety and depression therapy and he switched her medication from Zoloft to Vibryd.  (R. 344.)  He also recorded that "[a] form was also completed giving my opinion I do not feel she would be able to sustain gainful employment over the near future."  (*Id.*)

Between February and May 2012, Plaintiff was seen by a Certified Registered Nurse Practitioner ("CRNP"), five times at Behavioral Health Services Outpatient Clinic.  (R. 284-88.)  She was diagnosed with major depressive disorder, panic disorder, and premenstrual dysphoric disorder.  (*Id.*)  At the initial session on February 12, 2012, Plaintiff's was assessed a GAF score of 50, at her April 19, 2012, session her GAF was 65, and it was again 65 on May 31, 2012.  (R. 285, 285, 288.)  In April Plaintiff reported that the Zoloft was helping, and in May she said she felt she was doing better.  (R. 284, 285.)

On October 25, 2012, Plaintiff was seen by Christopher Royer,

5

Psy.D., for a consultative examination.  (R. 331-37.)  Dr. Royer

made the following findings:

> Ms. Smikle was pleasant and cooperative
> with evaluation and consented to procedure.
> She ambulated independently to the
> examination room and reported no significant
> sensory or motor abnormalities other than her
> pain.  She was fully alert and aroused
> throughout the evaluation.  Expressive speech
> was fluent and somewhat wandering.  Thought
> processes followed suit.  Associations were
> appropriate to topic.  No perceptual
> disturbances or other gross psychopathology
> were reported or observed.  Overall, her
> judgment appeared to be fair.

> On mental status exam, she was fully
> oriented.  She was able to say the day of the
> week, day of the month, month and year.  She
> is oriented to the current time of the day.
> She is oriented to location and remote
> personal information.  On a test of recent
> recall, her ability to learn and recall a
> list of four words over a brief delay was
> mildly impaired.  In this task, she recalled
> three words using a free recall strategy and
> one word using a recognition cue.  Simple
> auditory retention was adequate for the
> interview and for brief tasks.  She scored in
> the average range on a test of mental
> arithmetic.  Expressive speech was fluent and
> free of paraphasias.  She was able to
> comprehend and follow all types of
> instructions.  Reasoning by analogy was in
> the average range and without error.
> Overall, her fund of information was
> considered to be adequate for her age,
> education, and background.

> Her affect was quite dysphoric.  She
> described her mood as depressed much of the
> time.  She was very tearful during the
> interview, sometimes having to stop to manage
> her tears.  She sees herself as somewhat
> hopeless and stated on a few occasion [sic]
> that she could not live with herself anymore.

6

> She did indicate a desire to live to take
> care of her children, which was hopeful.  She
> denied any significant suicidal plan at this
> point.

(R. 335-36.)  Dr. Royer's "Diagnostic Impression" included major depressive disorder, severe, recurrent, and menstrual difficulties, chronic neck pain, and stenosis.  (R. 336.)  He assessed a GAF of 47.  (*Id.*)

Plaintiff saw Rebeccan Newcomer, CRNP, at Summit Behavioral Health on four occasions from January 1, 2013, through May 20, 2013.  (R. 386-93, 370-77.)  Satyajit Mukherjee, M.D., was the collaborating physician.  (*Id.*)  Ms. Newcomer's Assessment was Depressive Disorder Major Recurrent Severe Without Psychotic and Anxiety Disorder Generalized.  (*See*, *e.g.*, R. 371.)  Plaintiff generally presented with a depressed mood, ongoing anxiety, and dysphoric affect.  (*See*, *e.g.*, R. 370, 387.)  At these visits she was also reported to be alert, oriented, and well groomed with judgment, memory, attention, concentration and associations good, and fair insight.  (*Id.*)  Ms. Newcomer spent approximately fifteen minutes with Plaintiff at each visit.  (*Id.*)  She assessed Plaintiff with a GAF of 60 or 65.  (R. 388, 390, 392.)

On May 31, 2013, Plaintiff was voluntarily admitted to The Chambersburg Hospital after presenting to the emergency room extremely dysphoric, disorganized, and delusional.  (R. 394-95.) She said she had stopped taking her medication for three to four days and her anxiety was extremely high though normally she was a

7

happy, good-spirited person.  (R. 395.)  Plaintiff's diagnosis was major depressive disorder, recurrent, moderate severity, with questionable psychotic features.  (R. 394.)  She had a GAF of 25 to 30 on admission and 50 to 60 on discharge.  (R. 395.)  The Discharge Summary stated the following discharge recommendations: continue on current medications; follow up with Rebecca Newcomer, CRNP, at Summit Behavioral Health; and follow up with therapist as well as her primary care physician if needed.  (*Id.*)

At Plaintiff's June 20, 2013, and July 3, 2013, visits with Ms. Newcomer, Plaintiff reported that she was doing better and denied agitation, anxiety, confusion, delusions, depression, hallucinations, homicidal thoughts, loss of interest, obsessive thoughts, compulsive behaviors, racing thoughts, sleep pattern disturbance, suicidal thoughts, impulsivity or panic.  (R. 366-68.) Mental Status Exam showed that Plaintiff was alert, oriented, well groomed, in no acute distress, with clear speech and organized thoughts.  (*Id.*)  Ms. Newcomer noted that Plaintiff's mood was less depressed and she was less anxious.  (R. 366-69.)  Her affect was bright, and her judgment, attention, concentration and insight were good.  (*Id.*)  Her GAF was assessed to be 65.  (*Id.*)

Plaintiff was seen by Linda Olson, CRNP, of Summit Family Care on April 17, 2014.  (R. 407-08.)  Notes indicate that Plaintiff felt she had been traumatized by an abusive marriage.  (R. 407.) She was encouraged to consider counseling, and Plaintiff said she

8

had a counselor who had been effective for her in the past and Plaintiff would like to return to her.  (*Id.*)

Evidence of record shows that Plaintiff again saw Ms. Newcomer on June 18, 2014, when Plaintiff reported that she was more anxious, she had ongoing depression and a stressful family situation.  (R. 431.)  Plaintiff denied agitation, confusion, delusions, hallucinations, homicidal thoughts, loss of interest, obsessive thoughts, compulsive behaviors, racing thoughts, sleep pattern disturbance, suicidal thoughts, impulsivity or panic. (*Id.*)  Mental Status Exam showed that Plaintiff was alert, oriented, and well groomed with clear speech, organized thoughts, depressed mood, and increased anxiety.  (R. 432.)  Plaintiff's affect was bright and moderately anxious, and her judgment, attention, memory, insight and associations were intact.  (*Id.*) Plaintiff's GAF was assessed to be 65.  (*Id.*)  The plan was to increase Zoloft for depression and anxiety and prescribe Trazadone for the reported insomnia.  (*Id.*)

b.   *Physical Impairments*

On March 15, 2011, Plaintiff saw Dr. Wellmon for left sided back pain which radiated to the shoulder.  (R. 305.)  Physical examination showed lumbar spine tenderness.  (*Id.*)  The Plan was for Plaintiff to follow up with her pain clinic specialist and she was given prednisone in the interim to help with symptom management and the complained of exacerbation until she was seen the next week

9

in the pain clinic.  (*Id.*)

On August 2, 2011, physical examination by Dr. Wellmon showed that Plaintiff's neck was supple and she had right CVA tenderness with palpation.  (R. 304.)  Plaintiff's main complaints at that visit involved urinary tract problems for which she was treated. (*Id.*)

On October 31, 2011, physical examination by Dr. Wellmon showed right CVA tenderness with palpation but the purpose of her office visit was urinary tract symptoms for which she was treated. (R. 302.)  Plaintiff was treated in November for vaginosis and physical examination showed slight tenderness on palpation of her lumbar spine.  (R. 301.)  In December Plaintiff was again treated for a urinary tract infection and physical examination findings included right CVA tenderness.  (R. 300.)

On April 16, 2012, Plaintiff's chief complaint to Dr. Wellmon was severe lower back pain.  (R. 298.)  Physical examination showed that Plaintiff's neck was supple, she had no tenderness on palpation over the lumbar spine or lateral aspects of the spine, no masses or spasms were noted, and she ambulated hunched over.  (*Id.*) Plaintiff wanted to go to Hershey Medical Center pain clinic and was told the referral would be made.  (*Id.*)  She requested Percocet and was give a prescription for ten pills and two lidocaine patches.  (*Id.*)

Plaintiff saw Dr. Wellmon on June 12, 2012 for her chronic

10

back and neck pain.  (R. 297.)  Examination showed tenderness of the cervical, thoracic, and lumbar regions.  (*Id.*)  Dr. Wellmon noted that Plaintiff's recurrent low back and neck pain issues had previously been controlled with Ultram and she was give a refill. (*Id.*)

On June 13, 2012, Plaintiff saw John E. Olenczak, M.D., of the Pain and Spine Institute for the chief complaints of chronic pain, fibromytosis, neck pain, predominantly left-sided, and right-sided lower back pain.  (R. 318.)  X-rays were taken and showed the Harrington rod which had been placed when she was twelve years old for scoliosis was well placed, cervical spine revealed some loss of cervical lordosis with some mild facet sclerosis noted, and mild degenerative disc disease.  (*Id.*)  Physical examination showed that Plaintiff was in distress, she was "essentially holding the left side of her head with her palm"; motor strength in the upper extremities 5+ and equal bilaterally; deep tendon reflexes 2+ and brisk; sensory examination intact; Spurling test negative for radicular pain; pain primarily left-sided with left cervical facet loading; pain distribution C2 though C5.  (R. 319.)  Large trigger points were noted within the cervical musculature, including the trapezius and rhomboid region, and these were treated with trigger point releases.  (*Id.*)  Regarding Plaintiff's lumbar spine, Dr. Olenczak recorded limited flexion, limited extension, secondary to her hardware.  (*Id.*)  Straight leg raise was negative; deep tendon

reflexes 2+ and brisk; sensory examination intact; no step off noted; supple anterior cervical musculature; no masses or bruits; lungs clear to auscultation; and heart regular. (R. 319.) His Assessment was fibromytosis, lumbar, cervical spondylosis, history of scoliosis, degenerative cervical and lumbar disc disease, neck pain, and low back pain. (*Id.*) Dr. Olenczak planned to do medial branch and therapeutic injections at C2, C3, C4, and C5, and right lumbar facet injections at L3-4, L4-5, and L5-S1. (*Id.*) He prescribed Vicodin (not to exceed four tablets daily), Amitriptyline, and Mobic. (*Id.*)

At her June 26, 2012, visit with Dr. Olenczak, Plaintiff's main complaints were neck pain and right buttock pain. (R. 320.) Plaintiff reported some limited short-term relief after the previous injections, and Dr. Olenczak discussed long-term pain management with her, including cervical medial branch rhizotomies at C2, C3, C4, and C5. (*Id.*) On July 12, 2012, Plaintiff had a right sacroiliac joint injection under fluoroscopy and medial branch rhizotomies at C2, C3, C4, and C5. (R. 323.)

On July 16, 2012, Plaintiff visited Dr. Wellmon after having injections involving her cervical region. (R. 296.) He noted that Plaintiff had tenderness in the cervical region and had some new suboccipital pain complaints which would resolve spontaneously and may have been secondary to inflammation from her injection. (*Id.*)

At her visit with Dr. Olenczak on July 27, 2012, Plaintiff had

new complaints including left temporal headache, pain along the anterior cervical musculature on the left with radiation to the anterior triangle of the neck, and radiating left leg pain.  (R. 321.)  Physical examination showed no pain over the sacroiliac joint with provocation, negative straight leg raise, reflexes +2 and brisk bilaterally, and intact sensory examination.  (*Id.*)  She had a sensory examination performed over posterior triangle of her neck to cold and hot--she was unable to appreciate cold on the area of distribution treated.  (*Id.*)  Plaintiff's limited motion of the cervical spine was unchanged from her baseline examination, and Spurling test was negative.  (*Id.*)  He noted that Plaintiff had no weakness in her upper extremity, her refelxes were +2 and brisk, and no trophic changes.  (*Id.*)  Dr. Olenczak ordered MRIs of the cervical and lumbar spine and adjusted her medications.   (R. 321.)

Plaintiff reported worsening pain to Dr. Wellmon on August 8, 2012, and she felt she did not have appropriate pain control.  (R. 349.)  The office notes indicate that Plaintiff was advised to return to pain management or orthopedic for medications because Dr. Wellmon would no longer prescribe her pain medications.  (*Id.*)  On August 23, 2012, Plaintiff called Dr. Wellmon's office with slurred and slightly garbled speech requesting Percocet for her back pain; she was told that because she was already affiliated with a pain specialist (Dr. Olenczak), Dr. Wellmon's office was not allowed to prescribe medications.  (R. 348.)

Plaintiff saw Dr. Wellmon on September 6, 2012, complaining of worsening pain.  (R. 347.)  She had tenderness of the cervical spine diffusely.  (*Id.*)  Dr. Wellmon noted that Plaintiff had an appointment in two weeks at Hershey Medical Center regarding her spinal stenosis, and she had some improvement with Nucynta.  (*Id.*)  At her September 2012 visit, Plaintiff had tenderness in the inferior cervical region and it was noted she would be following up with orthopedics and surgery regarding her cervical degenerative findings.  (R. 346.)

Plaintiff was seen in January for another urinary tract infection and did not show for her February 7, 2013, appointment.  (R. 345.)

On January 9, 2013, Plaintiff saw Steven Groff, M.D., for neck and arm pain and two large disc herniations.  (R. 378.)  She said she would like to consider surgery.  (*Id.*)  Dr. Groff diagnosed cervical stenosis and neck pain; he recommended anterior cervical discectomy and fusion at two levels.  (*Id.*)  Plaintiff had the surgery on January 28, 2013.  (R. 380.)  At her February 7, 2013, follow up visit, Dr. Groff reported Plaintiff was making slow but steady progress, diagnostic studies showed good position of the bone graft and plate, and he expected further improvement.  (R. 382.)  At her April follow up visit, Dr. Groff again reported that Plaintiff was making slow progress.  (R. 383.)  He also noted that depression and smoking were not going to help her situation.  (*Id.*)

14

He planned to recommend therapy and strengthening, and release Plaintiff from his care.  (*Id.*)

On February 18, 2013, Plaintiff saw Dr. Wellmon for medication refills on pain medications--Ultram and Oxycodone.   (R. 344.) Plaintiff was given a refill for Tramadol, but he did not continue Oxycodone.  (*Id.*)

On November 7, 2013, Plaintiff had her initial visit at Summit Family Practice and was seen by Linda Olson, CRNP.  (R. 403-04.) Plaintiff reported that the pain related to her neck surgery resolved over the summer and she thought the cold weather was making it return.  (R. 403.)  She described intermittent pain that radiated from her neck to her elbow which felt like an electrical impulse and worsened when she tried to pick up things.  (*Id.*) Plaintiff also reported that she was seeing Ms. Newcomer for depression and Ms. Newcomer had put her on Gabapentin which helped with the pain.  (*Id.*)  Physical examination showed no cervical spinous process tenderness on palpation, no pain in the trapezius or sternocleidalmastoid muscle on palpation, no active pain at the time, no pain on palpation of the elbow on the lateral medial side, intact sensation, and slightly decreased grasp in the left hand (4/5 compared with 5/5 on the right).[2]  (*Id.*)

---

[2]  Plaintiff again saw Ms. Olson in February, April, and May 2014 without mention of the neck pain complained of in November 2013.  (R. 405, 408, 426.)

On January 23, 2014, Plaintiff saw Ali Yousufuddin, M.D., at the Pain Institute of Central PA with the chief complaint of chronic neck pain since 2005. (R. 410.) She reported that the pain improved after the 2013 neck surgery but had gradually gotten worse over the preceding five months. (*Id.*) She described the pain in the left low neck radiating to her left elbow at times as constant, dull, aching, and sometimes sharp and stabbing. (*Id.*) She rated her pain as 7/10 at the time and said it varies from 3-10/10; it was aggravated by activity and relieved by pain medications and lying down. (*Id.*) Plaintiff reported that her ability to do chores around the house had become difficult due to the pain and her sleep was sometimes disturbed. (*Id.*) Dr. Yousufuddin recorded that Plaintiff had a history of chronic mid back pain but that was not her main concern at the time. (*Id.*) He found that Plaintiff had tenderness in the left paravertebral areas at C6/7 and C7/T1 levels; she complained of neck pain with extension and twisting her neck to the left side; the motion/sensory exam of her upper extremities was grossly intact. (R. 412.) Dr. Yousufuddin's assessment was "chronic neck pain, left cervical facet arthropathy and left cervical spondylosis without myelopathy." (*Id.*) He planned to schedule Plaintiff for left cervical facet injections at the affected levels and perhaps radiofrequency ablation, and start her on Tramadol. (R. 412-13.)

Plaintiff had the injections on January 29, 2014, and she

reported marginal relief from them but the left-sided neck pain continued--rated as 8/10 at her February 10, 2014, office visit. (R. 416.)  Plaintiff said she was not having neck pain at the time of the visit and denied restriction to mobility.  (*Id.*)  On examination, Dr. Yousufuddin recorded that Plaintiff had tenderness present in the paravertebral area at C6/7 level and she complained of increased neck pain with flexion of her cervical spine.  (R. 417.)  His assessment was "[c]hronic neck pain, left cervical radiculopathy, status post cervical fusion in the recent past and degenerative disc disease of the cervical spine."  (*Id.*)  Dr. Yousufuddin planned a cervical epidural steroid injection and perhaps a series of them if effective, and he also planned a change in her medication regimen.  (*Id.*)

Plaintiff had the procedure on February 21, 2014, and reported marginal pain relief at her March 7, 2014, office visit, complaining of 6/10 neck pain at the time.  (R. 420.)  Sensory exam of the upper extremities was grossly intact, but her hand grip strength on the left side was 4/5 compared with 5/5 on the right. (*Id.*)  Dr. Yousufuddin recorded that Plaintiff had tenderness present in the midline and left paravertebral area at C6/7 level and she complained of increased neck pain with flexion of her cervical spine.  (R. 421.)  He decided to hold off on further injections because she did not get significant pain relief from them.  (*Id.*)  Dr. Yousufuddin continued the medication regimen and

noted Plaintiff would be an optimal candidate for a TENS/muscle stimulator. (*Id.*)  At Plaintiff's March 27, 2014, office visit both her complaints and examination findings were much the same. (R. 422.)  She reported that the Tramadol helped with the pain but caused constipation and she had not done the TENS trial because she was waiting for insurance approval. (*Id.*)  Dr. Yousufuddin adjusted Plaintiff's medication regimen, noted that she would benefit from neck strengthening exercises, and referred her to Dr. Boyer for help with this.  (R. 423.)

In May 2014, Plaintiff still awaited approval for the TENS trial and reported that her medications may help with the pain and she tolerated the regimen well. (R. 424.)  Dr. Yousufuddin again planned to schedule Plaintiff for cervical epidural steroid injection at C6/7 level.  (R. 425.)  He also noted she was an optimal candidate for a neck brace as well as the TENS unit, and he would give her a two week prescription for Tylenol with Codeine No. 3 to be taken as needed.  (*Id.*)

At her June 12, 2014, office visit with Dr. Yousufuddin, Plaintiff reported temporary relief (25%) following the steroid injection and added complaints of muscle spasms in her neck at times.  (R. 441.)  Her physical examination was similar to previous visits.  (R. 442.)  Dr. Yousufuddin planned to repeat the steroid injection to see if a series would help, he adjusted her medication regimen, and again discussed the benefits of a neck brace.  (R.

18

442.)

In July 2014, Plaintiff reported a 40-50% reduction in pain relief following the June 18, 2014, injection but the pain was gradually returning and she also had frequent headaches associated with it.  (R. 444.)  Her main complaint at the office visit was right-sided low back/buttock pain which she rated as 8/10 at the time.  (*Id.*)  Upper extremity examination was unchanged and motor/sensory exam of the lower extremities was grossly intact with a negative straight leg raising test bilaterally.  (R. 445.) Plaintiff had some tenderness present in the midline and left paravertebral area at C6/7 level, she complained of mildly increased neck pain with flexion of her cervical spine, and examination of her low back showed marked tenderness over the right sacroiliac joint and positive Patrick's test on the right side. (*Id.*)  Dr. Yousufuddin planned to schedule Plaintiff for a right sacroiliac joint pain injection and perhaps radiofrequency ablation.  (*Id.*)  He indicated he may schedule a repeat cervical epidural injection in the future and he adjusted Plaintiff's medication regimen, including the addition of a limited prescription for Vicodin, and the addition of a prescription for muscle spasms.  (*Id.*)

**2.**   **Opinion Evidence**

*a.*   *Mental Impairments*

As noted previously, Plaintiff was seen by Christopher Royer,

19

Psy.D., for a consultative examination on October 25, 2012.  (R. 331-37.)  Based on the findings detailed above, Dr. Royer opined that Plaintiff had moderate difficulties in her abilities to understand and remember detailed instructions, carry out detailed instructions, and make judgments on simple work-related decisions based on slow thought processes, Plaintiff was distracted by symptoms, and she had mild memory impairment.  (R. 331.)  Dr. Royer also concluded Plaintiff was moderately limited in her ability to interact appropriately with supervisors and had marked limitations in her abilities to interact appropriately with the public and co-workers, and respond appropriately to work pressures in a usual work setting and to change in a routine work setting.  (*Id.*)  Dr. Royer identified the medical/clinical findings supporting the assessment to be "very depressed, introverted, fixated on her distress."  (*Id.*)

On November 1, 2012, Douglas Schiller, Ph.D., a State agency psychologist, reviewed the evidence, including Dr. Royer's opinion, and concluded Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions, her ability to maintain attention and concentration for extended periods, her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, and her ability to work in coordination with or proximity to others without being distracted by them.  (R. 103-04.)

20

Dr. Schiller added that mental status and treatment information indicated that Plaintiff's mental abilities were consistent with her being able to understand and follow at the least one to five step instructions in a routine work setting.  (R. 104.)  Dr. Schiller also concluded Plaintiff was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors and her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.  (*Id.*)  Dr. Schiller added that despite these limitations, the record showed that Plaintiff had a history of managing the social demands of a work setting and current information was consistent with Plaintiff having retained such capabilities.  (*Id.*)  Regarding adaptation limitations, Dr. Schiller found Plaintiff moderately limited in her ability to respond appropriately to changes in the work setting, and her ability to set realistic goals or make plans independently of others.  (R. 105.)  This assessment was based on the fact that Plaintiff used the services of mental care professionals.  (*Id.*)  In explaining the differences between his assessment and Dr. Royer's, he noted that Dr. Royer's assessment was inconsistent with the totality of the evidence in the file.  (*Id.*)  Dr. Schiller specifically found that Dr. Royer's statements regarding Plaintiff's abilities in the areas of making occupational adjustments were not consistent with all of the medical and non-

medical evidence in the claims folder.  (*Id.*)  After noting that he found Plaintiff's allegations partially credible, Dr. Schiller concluded Plaintiff appeared to have the ability to manage the basic mental demands of routine substantial gainful employment. (*Id.*)

At Plaintiff's August 8, 2012, office visit, Dr. Wellmon noted that Plaintiff was "concerned about her disability regarding her anxiety [which] before was not completed as I do not have any evidence or documentation substantiating her chronic disability regarding her anxiety or depression."  (R. 349.)  At Plaintiff's two visits with Dr. Wellmon in September 2012, mental health issues were not discussed but at her next visit on January 24, 2013, Plaintiff wanted to discuss her anxiety/depression medications. (R. 345.)  In February 2013, Dr. Wellmon recorded that "[a] form was also completed giving my opinion I do not feel she would be able to sustain gainful employment over the near future."  (R. 344.)

In correspondence dated October 29, 2013, Marcia Rost, a therapist at Laurel Life, provided information about Plaintiff's mental health.  (R. 328, 385.)

> As per your request for information regarding Deshena Smikle surrounding her claim for disability benefits, I am unable at this time to provide detailed information concerning her treatment at the present time. Deshena had her initial session February 9, 2011 after a brief hospitalization for a suicide attempt.  Her original diagnosis was

> 311 Depressive Disorder NOS.  I changed
> Deshena's diagnosis to 296.23, Major
> Depressive Disorder, Single Episode, Severe
> Without Psychotic Features on February 23,
> 2011.  The change of diagnosis occurred after
> several sessions following her initial visit,
> learning more about her suicide attempt and
> her daily stressors that contributed to her
> new diagnosis.  Since that time, Deshena
> scheduled and attended bi-weekly or monthly
> sessions until November 2012.  The last
> session that Deshena attended was April 8,
> 2013; in fact, Deshena has only attended five
> sessions since November 2012; November 1, 8;
> January 16, 2013; March 28, 2013; and April
> 28, 2013.  Therefore, at this time I am
> unable to give a more detailed or
> professional impression for the purposes of
> this disability claim.

(R. 328, 385.)

b.   *Physical Impairments*

On September 11, 2012, Abu N. Ali, M.D., a state agency physician, reviewed the evidence and completed a Residual Functional Capacity Assessment.  (R. 101-03.)  He opined that Plaintiff could occasionally lift and/or carry twenty pounds; she could stand, walk, and sit for six hours in an eight-hour day; she could occasionally climb ramps, stairs, ladders, ropes and scaffolds; she could occasionally stoop, kneel, crouch, and crawl; and she should avoid even moderate exposure to hazards.  (*Id.*)  Dr. Ali provided a detailed explanation for his conclusions, pointing to Plaintiff's activities of daily living, her relationships with others, the general effectiveness of treatment, and the facts that she was not attending physical therapy, did not need an assistive

23

device, and did not use a TENS unit.  (R. 103.)  He found Plaintiff partially credible and opined that she could perform work at the light exertional level.  (R. 103, 106.)

### 3. **Hearing Testimony**

Plaintiff's July 15, 2014, hearing was the second hearing before ALJ Sweeney; the May 8, 2014, had to be continued because Plaintiff was significantly under the effects of medications and was not able to proceed.  (R. 34.)  ALJ Sweeney tried to sort out who prescribed the hydrocodone Plaintiff reportedly took that day and when it was prescribed, but she was unable to do so.  (*Id.*)

The ALJ established that Plaintiff worked for one month after the alleged onset date: Plaintiff testified that she worked as an administrative assistant for Manpower in August 2013 but she was let go because her attendance wasn not good.  (R. 41.)  Plaintiff said this was because she had been going through a custody battle at the time.  (*Id.*)  ALJ Sweeney established that Plaintiff believed she was the better parent and was able to make all the mental and other decisions that were necessary for the best interest of her children who were eleven and thirteen at the time of the hearing.  (*Id.*)  Both children received SSI benefits and Plaintiff was the representative payee for both.  (R. 42.)

Plaintiff testified that she was unable to work because she is clinically depressed due to her severe pain which she had since her operation.  (R. 43.)

24

Regarding her three-day mental health hospitalization in May 2013, Plaintiff reported that she went voluntarily after her sister called an ambulance for her and Plaintiff did not contact any health care professional prior to her admission.  (R. 45.)  She added that she never talked to Ms. Newcomer about the hospitalization.  (*Id.*)  Plaintiff acknowledged that she made an agreement to do certain things upon discharge, including continuation of individual therapy.  (R. 45, 46.)  Plaintiff testified that, rather than seeking individual therapy, she saw her primary care doctor for her mental health needs and, after about a year's lapse, returned to see Ms. Newcomer for medication management in June of 2014 because she started to have panic attacks about every other week.  (R. 48, 49.)  Plaintiff clarified that she had not sought counseling from an individual therapist since her May 2013 hospitalization because her therapist, Marcia Rost, had stopped taking her insurance.  (R. 50; *see also* R. 328, 385.)  Plaintiff added that she had just started going to Franklin Family Services at the time of the hearing.  (R. 50.)

Regarding her spine problems, Plaintiff stated she had not had any course of physical therapy since her 2013 surgery by Dr. Groff. (R. 52-53.)  She testified that she continues to get shooting pain down her left arm, she has constant pain in her neck despite all of her medications, and she has pain in her lower back that makes her leg weak.  (R. 55, 57.)  Plaintiff said she had not seen an

orthopedic or neurologist with regard to her spine or had any studies since January 2013--her only treatment had been with Dr. Yousufuddin, a pain specialist. (R. 55-56, 57.) Plaintiff also said she had moved forward with the neck brace and was still waiting for approval of the TENS unit. (R. 58.)

Plaintiff testified that on a typical day she got her son up for school, cleaned intermittently for a total of about four hours, and took naps because she was exhausted. (R. 61.)

When again asked by ALJ Sweeeney why she said she had been unable to work since January 2011, Plaintiff responded it was because she had problems staying awake, her depression made her cry (she had crying spells almost daily), and she had anxiety attacks if she gets too worked up which happened about twice a month. (R. 61-62.)

The ALJ also asked Plaintiff what Dr. Yousufuddin's plans were for treating her pain, and Plaintiff responded that he just hoped the injections worked. (R. 64.) Plaintiff said she felt some relief from them and also said that she gets some relief from pain medications. (*Id.*)

## 4. **ALJ Decision**

As noted above, ALJ Sweeney issued her decision on August 4, 2014. (R. 11-18.) She made the following Findings of Fact and Conclusions of Law:

> 1. The claimant meets the insured status requirements of the Social Security Act

26

through December 31, 2016.

2.   The claimant has not engaged in
     substantial gainful activity since
     January 24, 2011, the alleged onset date
     (20 CFR 404.1571 *et seq.*).

3.   The claimant has the following severe
     impairments: degenerative disc disease
     of the cervical lumbar spine, cervical
     spondylosis, fibromyositis (lumbar),
     major depressive disorder, and anxiety
     disorder generalized (20 CFR
     404.1520(c)).

4.   The claimant does not have an impairment
     or combination of impairments that meets
     or medically equals the severity of one
     of the listed impairments in 20 CFR Part
     404, Subpart P, Appendix 1 (20 CFR
     404.1520(d), 404.1525, and 404.1526).

5.   After careful consideration of the
     entire record, the undersigned finds
     that the claimant has the residual
     functional capacity to perform light
     work as defined in 20 CFR
     404.1567(b) subject to the following
     limitations: normal breaks (as defined
     by the vocational expert); occasional
     hand/arm levers and cranks with the left
     upper extremity; no limitation with
     pressing a button or knob with the left
     upper extremity; occasional foot/leg
     pedals and levers with the right lower
     extremity but no limitation with
     pressing a button or knob; can
     occasionally climb ramps and stairs,
     balance, stoop, kneel and crouch/squat;
     no climbing ladders, poles, ropes or
     scaffolding; due to the claimant's neck
     pain no crawling (on hands and knees or
     feet): no work around or with drugs due
     to the claimant's history of drug use
     (such as where marijuana is legal or
     around prescription medications); due to
     the claimant's medication use, no
     concentrated exposure to extreme cold,

large vibrating objects or surfaces,
work around or with hazardous machinery,
work in high exposed places, work around
large fast moving machinery on the
ground, work around or with sharp
objects, or work around or with toxic or
caustic chemicals; and limited to
unskilled work (defined as simple duties
that can be learned on the job in a
short period of time).

6.   The claimant in unable to perform any
     past relevant work (20 CFR 404.1565).

7.   The claimant was born on July 5, 1978
     and was 32 years old, which is defined
     as a younger individual age 18-49, on
     the alleged disability onset date (20
     CFR 404.1563).

8.   The claimant has at least a high school
     education and is able to communicate in
     English (20 CFR 404.1564).

9.   Transferability of job skills is not
     material to the determination of
     disability because using the Medical-
     Vocational Rules as a framework supports
     a finding that the claimant is "not
     disabled," whether or not the claimant
     has transferable job skills (See SSR 82-
     41 and 20 CFR Part 404, Subpart P),
     Appendix 2).

10.  Considering the claimant's age,
     education, work experience, and residual
     functional capacity, there are jobs that
     exist in significant numbers in the
     national economy that the claimant can
     perform (20 CFR 404.1569 and
     404.1569(a).

11.  The claimant has not been under a
     disability, as defined in the Social
     Security Act, from January 24, 2011,
     through the date of this decision (20
     CFR 404.1520(g)).

(R. 17-26.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to determine whether a claimant is disabled.[3]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S.

_____

[3]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs that existed in significant numbers in the national economy.  (R. 25-26.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise. A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion. *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted). The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence. If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are

rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Comm'f of Soc. Sec.*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported

by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that the Acting Commissioner's decision should be reversed or remanded for the following reasons: 1) the ALJ erred in failing to address all medical opinions of record; 2) the ALJ erred in failing to follow the treating physician rule; 3) the ALJ erred in failing to discuss Plaintiff's mental impairment; and 4) the ALJ erred in finding Plaintiff not credible.  (Doc. 14 at 14-15.)

## A.    *Medical Opinions of Record*

Plaintiff first asserts the ALJ erred by failing to address all medical opinions of record: specifically the ALJ did not properly consider opinions which stated that Plaintiff's depressive disorder was severe, and her conclusion that Plaintiff had no work related limitations other than being limited to unskilled work was strictly the ALJ's own opinion unsupported by any medical evidence in the record. (Doc. 14 at 17-23.) Defendant correctly notes that this claimed error relates to the ALJ's evaluation of Plaintiff's mental health impairments and responds that the ALJ properly evaluated these impairments. (Doc. 15 at 11-21.) I conclude Plaintiff has not shown that this claimed error is cause for reversal or remand.

Defendant identifies five bases upon which Plaintiff claims the ALJ did not properly consider medical evidence related to her mental health impairments: 1) she failed to consider diagnoses that classified Plaintiff's depressive disorder as "severe"; 2) she failed to properly evaluate Dr. Royer's opinion; 3) she improperly relied on GAF scores; 4) she improperly relied on her lay opinion in determining the RFC assessment; and 5) she failed to account for Plaintiff's moderate limitation in concentration, persistence, or pace. (Doc. 15 at 11 (citing Doc. 14 at 17-23).)

## 1.    **Severity of Plaintiff's Depressive Disorder**

Plaintiff identifies several medical records which diagnosed

34

her depressive disorder to be "severe."  (Doc. 14 at 18-20.)
Plaintiff's string of citations to the record in which medical
providers and reviewers characterized her depression as severe and
her references to regulations which require an ALJ to evaluate
medical opinions of record (*id.*), do not add up to a cohesive
argument pointing to ALJ error.  As Defendant notes, Plaintiff does
not provide authority to support the proposition that a diagnosis
of depressive order, if characterized as "severe," is *per se*
disabling.   (Doc. 15 at 12.)  Plaintiff does not argue otherwise
in her reply brief, but states that the term "severe" has a
specific meaning in the Diagnostic and Statistical Manual of Mental
Disorders, 5th Ed., issued in 2013 which includes that "'the
intensity of the symptoms is seriously distressing and
unmanageable, and the symptoms markedly interfere with social and
occupational functioning.'"  (Doc. 16 at 1 (quoting Diagnostic and
Statistical Manual of Mental Disorders, 5th Ed.).)  Plaintiff
further asserts that although the use of the term "severe" does not
direct a finding of disability, the ALJ must discuss the weight she
gave the opinions and here the ALJ failed to do so.  (Doc. 16 at 1-
2.)

Plaintiff incorrectly states that ALJ Sweeney did not consider
the opinion of Ms. Rost.  (Doc. 14 at 17.)  Although she did not
attribute the evidence to Ms. Rost by name, ALJ Sweeney cited Ms.
Rost's correspondence when she noted that "another therapist was

unable to render an opinion as to the claimant's alleged disability." (R. 22 (citing Ex. 10F/1 [R. 385]).) Further, the ALJ's statement is accurate in that Ms. Rost simply reviewed her diagnosis and Plaintiff's attendance history; Ms. Rost did not indicate any functional limitations or otherwise provide an opinion which the ALJ was obligated to review in any greater detail. Ms. Rost specifically said that beyond the diagnosis and attendance information, she was "unable to give a more detailed or professional impression for the purposes of this disability claim." (*See* R. 328, 385.)

Importantly, specific review of the diagnostic terms found in the medical evidence is not an integral part of the disability determination. Because the outcome of a case depends on the demonstration of functional limitations rather than a diagnosis, a claimed error related to the characterization of a diagnosis would be harmless. *See Alexander v. Shalala*, 927 F. Supp. 785, 792 (D.N.J. 1995), *aff'd*, 85 F.3d 611 (3d Cir. 1996) (*per curiam*); accord, *Walker v. Barnhart*, 172 F. App'x 423, 426 (3d Cir. 2006) ("Mere presence of a disease or impairment is not enough[;] a claimant must show that his disease or impairment caused functional limitations that precluded him from engaging in any substantial gainful activity."). Therefore, Plaintiff's assertion that the ALJ did not properly consider the medical evidence on the basis that he did not discuss the major depressive diagnosis to include the term

36

"severe" is not cause for reversal or remand.

## 2.   **Dr. Royer's Opinion**

Plaintiff criticizes the ALJ's consideration of the opinion of Dr. Royer, a consulting examiner, because she rejected the limitations found in his opinion "without adequate discussion even though it was well supported by the rest of the evidence in the record as to Plaintiff's mental impairments." (Doc. 14 at 19.) Plaintiff does not specify why the discussion was "inadequate" or cite other evidence of record supporting Dr. Royer's determination that Plaintiff had marked limitations in multiple work-related areas of functioning. As noted by Defendant, the ALJ cited the facts that the opinion was based on an isolated examination and was not consistent with evidence of record, particularly referencing the conservative level of treatment and high GAF scores received from Plaintiff's treating therapist. (Doc. 15 at 13 (citing R. 23; *Hock v. Comm'r of Soc. Sec.*, ---F. App'x---, 2016 WL 1359077, at *1-2 (3d Cir. 2016) (finding no error in ALJ's decision to give little weight to an examining psychologist's opinion that was based only on one examination and contained more extreme conclusions than the claimant's treating source)).) Given ALJ Sweeney's detailed discussion of the reasons she attributed little weight to Dr. Royer's opinion (R. 24) and the Court's conclusion that her analysis is consistent with relevant authority including 20 C.F.R. § 404.1527, Plaintiff's conclusory assertion of error is not cause

for reversal or remand.

**3.   GAF Scores**

Plaintiff states that in rejecting lower GAF scores, the ALJ appears to be putting some weight on higher scores.  (Doc. 14 at 21.)  Defendant maintains that the ALJ committed no error in evaluating GAF scores in this case.  (Doc. 15 at 15.)  I conclude Plaintiff has not shown the ALJ erred on the alleged basis.

Pursuant to Social Security Administration rules, a claimant's GAF score is not considered to have a "direct correlation to the severity requirements." *Watson v. Astrue*, Civ. A. No. 08-1858, 2009 WL 678717, at *5 (Mar. 13, 2009) (citing 66 Fed. Reg. 50746, 50764-65 (2000)).  While the significance and use of GAF scores has been debated since the GAF scale was eliminated from the Diagnostic and Statistical Manual of Mental Disorders, an ALJ is not precluded from considering GAF scores as evidence.  As explained in *Forster v. Colvin*, Civ. A. No. 3:13-CV-2699, 2015 WL 1608741 (M.D. Pa. Apr. 10, 2015),

> "[d]ue to concerns about subjectivity in application and a lack of clarity in the symptoms to be analyzed, the [American Psychiatric Association] abandoned the GAF score in its recently published fifth edition of the Diagnostic and Statistical Manual [of Mental Disorders] ("DSM-5")." *Solock ex rel. F.A.R.P v. Astrue*, No. 1:12-CV-1118, 2014 WL 2738632, at *6 (M.D. Pa. June 17, 2014) (citing Am. Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders 5d,* 16 (2013)). "It was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of

> clarity ... and questionable psychometrics in routine practice." *See* Am. Psychiatric Ass'n, Diagnostic and Stat. Manual of Mental Disorders, DSM-516 (5th ed. 2013). In response, the Social Security Administration now allows ALJs to use GAF ratings as opinion evidence when assessing disability claims involving mental disorders; however, a "GAF score is never dispositive of impairment severity," and thus an ALJ should not "give controlling weight to a GAF from a treating source unless it is well supported and not inconsistent with other evidence." SSA AM-13066 at 5 (July 13, 2013).

2015 WL 1608741, at *9 n.2.  The Third Circuit Court of Appeals concluded an ALJ's failure to discuss two GAF scores of 50 did not warrant remand in *Rios v. Commissioner of Social Security*, 444 F. App'x 532, 535 (3d Cir. 2011) (not precedential), but, significantly, the Circuit Court distinguished the situation from cases where the failure to discuss relevant GAF scores was deemed error because an ALJ is not permitted to "cherry pick" GAF scores in support of his decision or ignore medical evidence that runs counter to his finding.  *Rios*, 444 F. App'x at 535 (citing *Dougherty v. Barnhart*, No. 05-5383, 2006 WL 2433792, at *10 n.4 (E.D. Pa. Aug. 21, 2006) (citations omitted)); *see also Gilroy v. Comm'r of Soc. Sec.*, 351 F. App'x 714, 716 (3d Cir. 2009).

Here Plaintiff cites the Federal Register concerning the GAF scale and Mental Listing 12.00D, including the statement that "[i]t does not have direct correlation to the severity requirements in our mental disorders listing."  (Doc. 14 at 21 (citing 65 Fed. Reg. 50746-01, 50764-65).)  Plaintiff does not present an argument as to

how this statement supports ALJ error in mentioning GAF scores.

Defendant agrees that GAF scores do not have a direct correlation for purposes of mental impairments in the Listing of Impairments (Doc. 15 at 15) but notes the Third Circuit has found no error where an ALJ discounted opinion evidence in light of GAF scores of 60 or 65. (Doc. 15 at 15 (citing *Grogan v. Comm'r of Soc. Sec.*, 459 F. App'x 132, 139 (3d Cir. 2012) (finding that the ALJ properly gave little weight to a treating source's opinion indicating moderate, severe, and extreme limitations where evidence of record showed GAF scores of 60 or higher)).) Defendant also points to the ALJ's explanation of her consideration of GAF scores. (*Id.* (citing R. 24).)

I conclude ALJ Sweeney did not err in her consideration of Plaintiff's GAF scores: she explained the reason for discounting certain scores and indicated that she nonetheless considered them in combination with the other evidence. (R. 24.) There is no indication of the cherry picking prohibited in *Rios* or otherwise improper consideration of GAF scores. Thus, Plaintiff's conclusory statement of error is not cause for reversal or remand.

**4.   Lay Opinion**

Plaintiff states the ALJ's determination that Plaintiff "was limited to unskilled work but had no other limitations in work related requirements was strictly the Administrative Law Judge's own medical opinion unsupported by any medical evidence in the

record." (Doc. 14 at 23.)  Defendant asserts the ALJ relied on medical opinion evidence in determining Plaintiff's RFC.  (Doc. 15 at 16-17.)  I conclude Plaintiff has not shown the ALJ erred on the basis alleged.

Plaintiff specifically notes the ALJ did not include limitations "such as responding appropriately to the public, coworkers or supervisors, responding appropriately to work situations or changes or concentrating, focusing or working at an acceptable pace." (Doc. 14 at 23.)  These limitations concern mental health related issues.  ALJ Sweeney's decision contains a detailed discussion of the record and the rationale supporting her RFC determination in general (R. 20-24) and consideration of Plaintiff's mental health impairments in particular (R. 22-23). Plaintiff does not acknowledge the analysis set out in the decision, and she does not point to error regarding the ALJ's reliance on specific evidence.  Plaintiff's conclusory assertions cannot support her claimed error.  Therefore, she has not shown it is cause for remand or reversal.

5.  **Concentration, Persistence or Pace Limitations**

Another aspect of Plaintiff's argument that the ALJ failed to fully discuss her mental health impairments is her assertion that, although the ALJ found that Plaintiff had moderate difficulties in concentration, persistence and pace, she failed to include any limitations from this impairment in her RFC determination.  (Doc.

41

14 at 27-28.)   Defendant maintains the ALJ properly accounted for these limitations.   (Doc. 15 at 19.)   I conclude Plaintiff has not shown the ALJ erred on the basis alleged.

As noted above, ALJ Sweeney extensively discussed evidence related to mental health impairments in support of her RFC determination.   (R. 22-24.)   She also differentiated her step two finding of moderate difficulties with concentration, persistence or pace from the residual functional capacity assessment.   (R. 18-19.) In her RFC analysis, ALJ Sweeney's findings included that Plaintiff "generally presented with good judgment, attention, memory, concentration and insight," (R. 23 (citing Ex. 8F)), "she was consistently assigned high GAF scores (of above 60) by her treating providers which suggests she only experiences mild symptoms per the DSM" (*id.* (citing Ex. 1F/4)), and "recent records show that the claimant continues to present with high GAF scores and intact judgment, attention, memory, insight and associations" (*id.* (citing Ex. 15F/2)).   ALJ Sweeney made the specific finding that "[t]here is no evidence of significant social deficits or adaptation limitations to substantiate social or adaptation limitations.   Only mild memory impairment was noted; however, the undersigned finds that the claimant should be limited to unskilled work given her mood disturbance, which could affect her ability to concentrate." (R. 24.)

The analysis set out in Plaintiff's brief involves step two

42

Mental Listings considerations, and the cited section specifically relates to "marked limitation in concentration, persistence, or pace." (Doc. 14 at 27-28 (quoting 20 C.F.R., Part 4, Subpart P, App. I, 12.00C(3)).)  ALJ Sweeney did not find a marked limitation in this area (R. 18), and Plaintiff does not explain how the quoted material supports her argument that the ALJ erred in her RFC determination.  Nor does Plaintiff show how Plaintiff failed to follow 20 C.F.R. 404.1520a(e)(2).  Given the detailed analysis contained in ALJ Sweeney's decision, Plaintiff's conclusory assertions are inadequate and do not show the ALJ erred on the basis alleged.

**B.**    ***Treating Physician's Opinion***

Plaintiff maintains the ALJ failed to give appropriate weight to the opinion of the treating physician pursuant to 20 C.F.R. § 404.1527.  (Doc. 14 at 23.)  Plaintiff has not shown that this claimed error is cause for reversal or remand.

Section 404.1527(a)(2) provides that "[m]edical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."

With this claimed error Plaintiff's cites the records of Dr. Olenczak, Dr. Groff, Dr. Yousufuddin, Ms. Rost, Ms. Newcomer, Ms.

Olson, Dr. Mukherjee, and Chambersburg Hospital.  (Doc. 14 at 24.)
Plaintiff does not point to a single opinion issued by any of these
sources; rather, she references only diagnoses and treatment
rendered--information which does not satisfy the definition of
opinion.  (*Id.* at 26-27.)  Therefore, the weight accorded medical
opinions pursuant to 20 C.F.R. § 404.1527 does not apply to the
information cited by Plaintiff.  Furthermore, ALJ Sweeney
referenced the records of all of the identified sources in her RFC
analysis.  (*See* R. 21-23.)  Plaintiff does not argue otherwise in
her reply brief but says the ALJ must make clear the weight she has
given to the records.  (Doc. 16 at 3.)  Plaintiff provides no
citation in support of the proposition that an ALJ must explicitly
assign weight to every piece of evidence in the record.  Insofar as
the obligations set out in 20 C.F.R. § 404.1527 do not apply here,
Plaintiff is mistaken and her claimed error is without merit.

**C.   *Credibility***

Plaintiff contends the ALJ erred in finding Plaintiff not
credible.  (Doc. 14 at 29.)  Defendant responds that the ALJ
properly evaluated Plaintiff's subjective complaints.  (Doc. 15 at
23.)  I conclude Plaintiff has not shown this alleged error is
cause for reversal or remand.

The Third Circuit Court of Appeals has stated that "[w]e
'ordinarily defer to an ALJ's credibility determination because he
or she has the opportunity at a hearing to assess a witness's

demeanor.'" *Coleman v. Comm'r of Soc. Sec.*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)). "Credibility determinations are the province of the ALJ and should only be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873 (3d Cir. 1983)).

Social Security Ruling 96-7p provides the following guidance regarding the evaluation of a claimant's statements about his or her symptoms:

> In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements. In basic terms, the credibility of an individual's statements about pain or other symptoms and their functional effects is the degree to which the statements can be believed and accepted as true. When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements.

SSR 96-7p. "One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." SSR 96-7p.

Here Plaintiff points to her testimony that "she can't work because she can't stay awake, her neck pain is always on her mind, she is depressed, cries and has anxiety attacks twice a month."

(Doc. 14 at 29.)  She also points to evidence supporting her neck and back impairments.  (Doc. 14 at 29-30.)

Interestingly, with these assertions Plaintiff relates her inability to work only to her mental impairments--it is not the neck pain itself which prevents her from working, but the fact that it is "always on her mind." (Doc. 14 at 9.)  As discussed previously, ALJ Sweeney thoroughly analyzed the evidence related to Plaintiff's mental health impairments.  She also set out a detailed analysis of the reasons she found Plaintiff not entirely credible. (R. 21-24.)  While Plaintiff's citations to the record support her claimed difficulties to a degree, she does not show how the ALJ erred in relying on evidence which she found undermined Plaintiff's subjective complaints.  Contrary to Plaintiff's assertion that her testimony is "fully supported by medical evidence of record," the evidence reviewed by the ALJ shows otherwise.  As with other alleged errors, conclusory assertions are not enough to establish that the ALJ erred on the basis alleged.  Therefore, this claimed error is not cause for reversal or remand.

### V. Conclusion

For the reasons discussed above, the Court concludes Plaintiff's appeal of the Acting Commissioner's decision is properly denied.  An appropriate Order is filed simultaneously with this Memorandum.

                    S/Richard P. Conaboy
                    RICHARD P. CONABOY
                    United States District Judge

DATED: June 17, 2016